J-S04011-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.K.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1747 MDA 2018 |

Appeal from the Decree September 19, 2018
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2017-02173

| | | |
|---|---|---|
| IN THE INTEREST OF: U.S.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.K.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1748 MDA 2018 |

Appeal from the Decree Entered September 19, 2017
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2174 of 2017

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.K.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1749 MDA 2018 |

Appeal from the Decree Entered September 19, 2018
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2175 of 2017

| | | |
|---|---|---|
| IN THE INTEREST OF: B.M.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.K.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1750 MDA 2018 |

Appeal from the Decree Entered September 19, 2018
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2176 of 2017

BEFORE:   SHOGAN, J., OTT, J., and STEVENS*, P.J.E.

MEMORANDUM BY SHOGAN, J.:                **FILED MARCH 11, 2019**

Appellant, B.K.D. ("Father"), appeals from decrees entered on September 19, 2018, in the Court of Common Pleas of Lancaster County, involuntarily terminating his parental rights to his three sons, K.B.D. (born in June of 2009), U.S.D. (born in September of 2010), and B.M.D. (born in November of 2014), and his daughter, N.M.D. (born in June of 2012) (collectively, "the Children").[1]  Upon careful review, we affirm.

---

* Former Justice specially assigned to the Superior Court.

[1] The orphans' court involuntarily terminated the parental rights of the Children's mother, J.L.P. ("Mother"), by decrees entered on December 21, 2017.  Mother did not file notices of appeal, and she is not a party to the instant appeals.

By way of factual background, on October 2, 2017, the Lancaster County Children and Youth Services Agency ("CYS") filed petitions for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). The involuntary termination proceeding occurred on December 21, 2017, during which CYS presented the testimony of its caseworker, Ms. Katie Wenrich, and the Court Appointed Special Advocate ("CASA"), Mr. William Lyons. Father testified on his own behalf.

The orphans' court summarized the facts of this case, as follows:

> [CYS] received a report, on November 4, 2016, that the [C]hildren were living with their paternal grandparents[,] and the grandparents, having serious medical issues, could no longer care for the [C]hildren. At the time of the report, Father was incarcerated[2] and Mother's whereabouts were unknown. [CYS] offered assistance to allow the [C]hildren to remain in their home, but the grandparents requested the [C]hildren be removed. [CYS] has a prior history with this family. In 2014, there were reports of suspected drug abuse by both parents. . . . [I]n 2016, Father was at the hospital with one of the children and was unable to give that child's name or date of birth. . . .

Trial Court Opinion, 10/26/18, at unnumbered 2 (citations to record omitted).

> [O]n November 9, 2016, [CYS] petitioned for and received physical custody of [the Children]. A [s]helter [c]are [h]earing was held on November 11, 2016, and [Mother] was not present. [Father] was present and waived the [s]helter [c]are [h]earing without admitting any of the allegations set forth in [CYS]'s petition for custody. An [a]djudication and [d]isposition hearing was held on December 15, 2016, finding the [C]hildren dependent. The [trial] [c]ourt approved Child Permanency Plans ("CPP") containing objectives for both parents.

---

[2] Father testified that he was incarcerated for crimes involving writing bad checks, which was a parole violation. N.T., 12/21/17, at 72, 78. Father previously was incarcerated for retail theft. *Id.* at 72.

- 3 -

*Id.* at unnumbered 1.

Father's CPP objectives required that he participate in mental health, drug and alcohol, and domestic violence evaluations, and follow all recommendations. Further, he was to remain crime-free, participate in parenting-skills training upon receipt of referrals from the mental health and drug and alcohol providers, maintain financial stability, and participate in supervised visitation with the Children. N.T., 12/21/17, at 15-24, 27-29. As of the date of the hearing, Father had made minimal progress on his CPP objectives. *Id.* at 30.

On December 21, 2017, the orphans' court involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b).[3] Father filed a timely appeal, and on August 7, 2018, this Court vacated the original decrees without prejudice and remanded the case for the court to appoint new counsel to represent the Children's legal interests pursuant to *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017), and its

---

[3] The Children were represented by a guardian *ad litem* ("GAL") who, at the conclusion of the testimonial evidence, recommended the involuntary termination of Father's parental rights. *See* N.T., 12/21/17, at 93-94.

progeny.[4] *See In re K.B.D., U.S.D., N.M.D., B.M.D.*, 195 A.3d 976, 119 MDA 2018 (Pa. Super. filed August 7, 2018) (unpublished memorandum).[5]

The certified record includes a letter[6] from the Children's legal counsel to the orphans' court revealing that the preferred outcome of the older three children, K.B.D., U.S.D., and N.M.D., was consistent with the original decrees. With respect to the youngest child, B.M.D., then age three, legal counsel advised that B.M.D. was unable to express or articulate his preferred outcome of the involuntary termination proceeding. *See In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests").

_____

[4] Pursuant to 23 Pa.C.S. § 2313(a), in a contested involuntary termination of parental rights proceeding, the subject child has a statutory right to counsel who discerns and advocates for the child's legal interests. *L.B.M.*, 161 A.3d at 174-175. A child's legal interests are defined as the child's preferred outcome, which may conflict with the child's best interests. *Id.*

[5] In addition, this Court directed that new counsel notify the orphans' court whether the result of the termination proceeding was consistent with each child's legal interest or whether counsel believed a new hearing was necessary to advocate separate preferred outcomes or placements for the Children. Further, we directed the court to conduct a new hearing if it served the purpose of providing the Children with an opportunity to advance their legal interests through new counsel. If the court deemed a new hearing unwarranted, then we directed the court to re-enter the original decrees.

[6] Counsel's letter dated September 17, 2018, was attached to the September 19, 2018 decrees involuntarily terminating Father's parental rights to the Children.

Based on legal counsel's letter, on September 19, 2018, the orphans'

court re-entered the original decrees involuntarily terminating Father's

parental rights to the Children. Father timely filed four separate notices of

appeal and concise statements of errors complained of on appeal pursuant to

Pa.R.A.P. 1925(a)(2)(i) and (b).[7] The orphans' court filed its Rule 1925(a)

opinion on October 26, 2018.[8]

On appeal, Father presents the following issues for our review:

I.      Whether the [c]ourt erred when it terminated Father's rights?

II.     Whether the [c]ourt erred in concluding that [CYS] had met its burden in proving that Father's parental rights should be terminated when there was evidence that he had been actively working on and completing the goals on his child permanency plan?

III.    Whether the [c]ourt erred in finding that terminating Father's parental rights would best serve the needs and welfare of the children?

Father's Brief at 4.

Our standard of review in this appeal is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

_____

[7] This Court consolidated the four appeals *sua sponte* on November 13, 2018.

[8] The Children's legal counsel filed a brief in this appeal wherein he argues in support of the involuntary termination decrees.

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, we conclude that the record supports the orphans' court's decrees pursuant to Section 2511(a)(1) and (b), which provide as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

- 7 -

\* \* \*

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b); **see also In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we must agree with the trial court as to only one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[9]

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to

---

[9] Based on our disposition, to the extent Father argues that the orphans' court abused its discretion in terminating his parental rights pursuant to Section 2511(a)(2) and (5), we need not review that argument.  **See B.L.W.**, 843 A.2d at 384 (holding that we need only agree with the orphans' court as to only one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm the involuntary termination of parental rights).  We reiterate that we affirm the orphans' court's decrees under Section 2511(a)(1) and (b).  However, we are constrained to point out that termination pursuant to Section 2511(a)(5) would not be proper because the Children were not removed from Father's care.  **See In re C.S.**, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care).

relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted). This Court has held:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Our Supreme Court has explained that parental duty "is best understood in relation to the needs of a child." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977).

> A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*Id.* (citations omitted).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment. The *S.P.* Court stated:

- 9 -

Applying in **McCray** the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." **Id.** at 655. We observed that the father's incarceration made his performance of this duty "more difficult." **Id.**

**S.P.**, 47 A.3d at 828. The **S.P.** Court continued:

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. **Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.** Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

[**McCray** 331 A.2d] at 655 (footnotes and internal quotation marks omitted).

**S.P.**, 47 A.3d at 828 (emphasis added). We have stated that the court must next consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). **Z.S.W.**, 946 A.2d at 730 (quoting **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998)).

With respect to Section 2511(b), this Court has stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention

- 10 -

to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted). Further, we have held that the trial court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert. *In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008).

On appeal, Father asserts that the orphans' court abused its discretion with respect to Section 2511(a) by not giving him additional time to complete his CPP objectives. He contends he was actively working toward his goals while in prison and after his release. Father's Brief at 10-14. Father asserts that he completed a mental health, or biopsychosocial, evaluation and a domestic violence evaluation, but he acknowledges that he did so after CYS filed the involuntary termination petition. *Id.* Father also asserts that he is employed full-time as a roofer. *Id.* at 14. Father admits that he did not participate in supervised visits with the Children, but claims that his work schedule and a lack of transportation prevented him from doing so. *Id.* at 15.

The orphans' court found that Father failed to complete any of his CPP objectives in the thirteen months that the Children were in CYS's physical custody, and that the termination of Father's parental rights served the

Children's needs and welfare. Trial Court Opinion, 10/26/18, at unnumbered 5-8. After review, we agree with the trial court that the evidence supports this conclusion.

Ms. Wenrich, the CYS caseworker, testified that Father was released on parole on March 16, 2017, at which time the Children had been in placement for four months. N.T., 12/21/17, at 29. On April 20, 2017, Father obtained a drug and alcohol evaluation in accordance with his parole requirements. *Id.* at 17. Thereafter, CYS learned that Father tested positive on May 14, 2017, for oxycodone and benzodiazepines, for which he did not have prescriptions. *Id.* at 19. On May 25, 2017, Father was re-incarcerated after admitting to recent heroin use while residing in his parents' home. *Id.* at 20. Father was released approximately six months later on November 6, 2017, to an inpatient drug and alcohol facility. *Id.* at 17. Father testified that he was discharged from the inpatient facility approximately twenty days later and that he is currently attending a ninety-day outpatient drug and alcohol rehabilitation program in accordance with his parole requirements. *Id.* at 58, 62.

With respect to Father's mental health objective, Ms. Wenrich testified that Father was scheduled to obtain an evaluation in June of 2017, but he failed to do so because of his re-incarceration on May 25, 2017. N.T., 12/21/17, at 17. Father obtained a mental health evaluation on December 15, 2017, six days before the subject proceeding. *Id.* Likewise, Father was scheduled to undergo a domestic violence evaluation on June 19, 2017, but

he failed to do so because of his re-incarceration. *Id.* at 22. Father received the domestic violence evaluation after his release from the inpatient facility on December 11, 2017. *Id.*

Ms. Wenrich stated that Father did not satisfy his parenting-skills objective. N.T., 12/21/17, at 23. Part of that objective was to have a parent educator come to Father's home and provide services. *Id.* These services were to begin once Father's mental health and drug-and-alcohol-treatment providers gave their recommendation. *Id.* However, Father did not secure proper housing, and he failed to acquire the necessary recommendations. *Id.*

With respect to supervised visitation, Ms. Wenrich testified that the court suspended Father's visits on August 18, 2017, due to lack of progress on his objectives. N.T., 12/21/17, at 27. She said that during the first four months of the Children's placement, CYS provided Father a bi-weekly visitation schedule at the Lancaster County prison. *Id.* at 27-28. Ms. Wenrich testified that a prison visit was scheduled for February 28, 2017; however, when Ms. Wenrich and the Children arrived at the prison, they were informed that Father was on work release and unavailable for a visit. *Id.* at 28. After Father's release from prison in March of 2017, CYS scheduled another visit for May 4, 2017, but Father failed to attend. *Id.* CYS subsequently scheduled visits for May 10, 2017 and May 17, 2017, but Father did not attend either of these visits. *Id.* at 28-29.

Ms. Wenrich stated that the Children last saw Father when they resided together in the paternal grandparents' home. N.T., 12/21/17, at 36. Despite the fact that Father's parents had previously contacted CYS and averred that they could not care for the Children, the paternal grandparents became a kinship care resource for the Children, and the Children returned to their home. *Id.* at 24. Ms. Wenrich testified that after they became a kinship care resource, CYS explained to the paternal grandparents that Father was not permitted to reside in their home as long as the Children were there. *Id.* at 24-25. Upon his release from prison on March 16, 2017, Father did not provide CYS with his address. *Id.* at 25. During the permanency review hearing on April 28, 2017, Father provided an address that CYS subsequently learned was incorrect. *Id.* at 24. On May 23, 2017, two days before Father's re-incarceration for heroin use, CYS learned that Father was residing in the paternal grandparents' home.[10] *Id.* at 25-27. Therefore, CYS removed the Children. CYS placed the older children, K.B.D. and U.S.D., in a kinship home with their maternal great aunt. *Id.* at 31. CYS placed the younger children, N.M.D. and B.M.D., together in a foster home. *Id.*

Ms. Wenrich noted also that while incarcerated and not residing with the Children, Father did not send gifts, cards, or letters to the Children. N.T.,

---

[10] Father testified that the Children returned to the paternal grandparents' home shortly after he began residing there upon his release from prison. N.T., 12/21/17, at 59.

12/21/17, at 47. Moreover, Father never made any telephone calls to the Children. *Id.* at 47.

In light of this evidence, we discern no abuse of discretion in the orphans' court terminating Father's parental rights pursuant to Section 2511(a)(1). Indeed, Father failed to perform any parental duties during the thirteen months that the Children were in CYS's custody, and Father failed to comply with all of his requisite objectives. Although Father obtained mental health and domestic violence evaluations, he did so only immediately before the subject proceeding, which was after CYS provided notice of the filing of the termination petitions. *See* 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."). During the thirteen months that the Children were in placement, Father did nothing "to exert himself to take and maintain a place of importance" in their lives. *Burns*, 379 A.2d at 540. We find that the record supports the orphans' court's conclusion that Father's conduct warranted termination of his parental rights pursuant to Section 2511(a)(1).

Likewise, the record supports the court's conclusion that terminating Father's parental rights serves the Children's needs and welfare pursuant to Section 2511(b). Father contends that the court abused its discretion under

the statutory section because CYS presented no evidence regarding the bond, if any, between him and the Children. The following case law is relevant:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "Children are young for a scant number of years, and we have an

obligation to see to their healthy development quickly. When courts fail . . .
the result, all too often, is catastrophically maladjusted children." ***Id.***

Instantly, Ms. Wenrich testified that the Children had behavioral
problems at the time of their placement in CYS's custody. N.T., 12/21/17, at
47-48. She testified on cross-examination by the GAL:

> Q. [Was i]t . . . very hard to maintain these children in foster
> homes in the beginning because their behavior was pretty out of
> control?
>
> A. Yes.
>
> * * *
>
> Q. Has it improved since they've been placed out of the
> grandparents' home?
>
> A. It has.

***Id.*** at 48. Ms. Wenrich attested that the Children are making progress in their
speech therapy and that the older three children all have Individualized
Education Plans. ***Id.*** With respect to the oldest children, K.B.D and U.S.D.,
Ms. Wenrich testified that they also attend play therapy, and they recently
were evaluated for a determination of whether additional speech and
occupational therapy was necessary. ***Id.*** at 32-33.

Ms. Wenrich said that K.B.D., who is eight years old, and U.S.D., who is
seven years old, do not discuss their biological parents or refer to them during
her visits at their kinship care home. N.T., 12/21/17, at 33. However, they
do ask her when they will be going to the paternal grandparents' home. ***Id.***

Similarly, she testified that she has never heard any of the Children speak of their parents. *Id.* at 36-37.

Ms. Wenrich testified that K.B.D. and U.S.D. refer to their kinship parents, their maternal great aunt and uncle, as "mom and dad." N.T., 12/21/17, at 33. She averred that they are very comfortable in the kinship home, and she described their attachment to the kinship parents as "very loving." *Id.* Ms. Wenrich said that the older children's kinship parents are a permanent resource and "had expressed interest in having all four children." *Id.* at 32. She explained that the kinship parents are currently awaiting "a waiver from the State" in order to place the younger children with them. *Id.*

Likewise, the younger children, N.M.D., age five, and B.M.D., age three, refer to their foster parents as "mom and dad." N.T., 12/21/17, at 35. Ms. Wenrich testified that their foster parents are also a permanent resource, and that they plan to facilitate visits between them and their older siblings.[11] *Id.* at 34-35.

After review, there is no evidence that a parent-child bond exists between Father and any of the Children. Father has a lengthy incarceration history. As noted above, Father did not contact the Children or see them while he was in prison during the thirteen months the Children were in placement.

---

[11] Ms. Wenrich further noted that the Children have been participating in visits with each other, and they "FaceTime" a "couple times" per week. N.T., 12/21/17, at 35-36.

The testimony demonstrates that the Children are doing well in their respective foster placements, which are permanent resources.[12]  We discern no abuse of discretion by the orphans' court in concluding that terminating Father's parental rights will serve the developmental, physical, and emotional needs and welfare of the Children.   Accordingly, we affirm the decrees involuntarily terminating Father's parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/2019

---

[12] Mr. William Lyons testified that he and his wife were the Children's CASAs on October 30, 2017.  N.T., 12/21/17, at 79.  He testified that he observed the older children, K.B.D. and U.S.D., on two occasions in their kinship care home, and he observed the younger children on one occasion in their foster home.  *Id.* at 79, 84.  Mr. Lyons's testimony did not reveal any parental bond between Father and the Children, and Mr. Lyons's testimony is consistent with that of Ms. Wenrich regarding the Children's loving relationship with their respective foster parents.